## Comly v. Department of Environmental Resources

*Elizabeth H. Steele,* pro se.
*Randall J. Brubaker,* for Commonwealth.
*Herbert K. Sudfeld, Jr.,* for permittee.

HARNISH, *Member,* May 13, 1981—This matter is before the board on the appeal by certain residents of Horsham Township, Montgomery County, Pa., from DER's issuance of NPDES permit 0050253 and water quality management permit 4680407 to the permittee, Wichard Sewer Company, Inc. These permits allow the permittee to construct a sewage treatment plant to service a proposed subdivision known as Country Springs Development. DER's plan approval for this plant was challenged and upheld at Thompson v. DER, EHB Docket No. 79-185-H issued October 16, 1980. Reference can be made to this adjudication for a further description of the development and area.

Hearings were held on this matter on February 2 and 3, 1981 and briefs were received from the parties on or about April 1, 1981.

## FINDINGS OF FACT

1. Appellant, Albert M. Comly, is an adult individual and resident of Horsham Township, with an address of 954 Limekiln Pike, Maple Glen, Pa.

2. Appellant, Elizabeth H. Steele, is an adult individual and resident of Horsham Township with an address of 711 Oak Terrace Drive, Ambler, Pa.

3. Appellee-permittee, Wichard Sewer Company, Inc., is a duly organized Pennsylvania corporation with offices located at P.O. Box 546, Willow Grove, Pa. and is a public utility chartered to provide sewer service to a certain residential housing development for 648 dwelling units on approximately 8,000 square foot lots which development is known as Country Springs.

4. In September of 1979 DER received a NPDES application from permittee. Notice as to the 30-day comment period pertaining to this NPDES application was published in 9 Pa. Bull. 3397 (1979), on October 6, 1979 pursuant to 25 Pa. Code §92.61.

5. Following said 30-day comment period on November 30, 1979, DER issued to permittee, NPDES permit number 0050253.

6. Notice of the issuance of the NPDES permit was published in 9 Pa. Bull. 4204 (1979).

7. The NPDES permit is also called a Part-I permit being the first permit issued in a two step procedure the second phase of which is the water quality management permit or construction permit. The Part-I permit authorizes a discharge to the waters of the Commonwealth; Part-II is a construc-

tion permit for the facilities designed to achieve the discharge authorized by the Part-I permit.

8. Appellee made application for its construction permit (Part-II permit) on January 21, 1980.

9. Appellants filed their instant appeal as it pertains to the NPDES permit some nine to ten months after the time period for taking such appeal provided by the board's rules had lapsed.

10. Appellants have presented no evidence that DER representatives did not properly issue both the NPDES or construction permit in accordance with the standards set down by the Clean Streams law and the rules and regulations of the Department of Environmental Resources.

11. The effluent from the proposed package treatment plant, the criteria for which is contained in the NPDES permit, will be as good as or better than the quality of the stream water presently in Park Creek.

12. Pursuant to the construction permit issued to permittee, the sewage treatment plant has been designed so as to enable it to meet the standards for effluent quality as set forth in the NPDES permit.

## DISCUSSION

The instant appeal is from two separate actions of DER. The first of these actions was the issuance of NPDES permit 0050253 to the permittee. This action took place on or about November 30, 1979. The second action was the issuance of water quality management permit 4680407 on or about October 3, 1980 to the same permittee. The NPDES permit authorized a discharge of approximately 227,000 gpd (.23 mgd) of sewage at a specified level of treatment into Park Creek at a location where the

Philadelphia Electric Company right-of-way crosses Park Creek near Limekiln Pike. The water quality management permit authorized construction of sewage treatment facilities designed to achieve the level of treatment set forth in the NPDES permit.

There has been no allegation that the appeal of the water quality management permit was untimely and, consequently, the permittee doesn't challenge appellants' right to raise issues about the construction of the proposed sewage treatment facilities. However, the focus of appellants' attack is upon the proposed discharge of sewage into Park Creek; they introduced no evidence concerning the construction of the plant.

Permittee has moved to quash this part of appellants' appeal. Permittee's initial motion to quash was addressed in an opinion and order of this board entered at the above-caption on December 4, 1980. While this opinion and order is incorporated herein, the gist of the opinion is that the permittee had failed to establish proof of publication of the issuance of the said NPDES permit in the Pennsylvania Bulletin and therefore had failed to establish a condition precedent to the operation of 25 Pa. Code §21.52(a), this board's rule regarding the appeal period.

Permittee renewed its motion and offered in support thereof proof of publication of the issuance of NPDES permit no. 0050253 in the December 22, 1979 Pennsylvania Bulletin. Appellants did not challenge the accuracy of this proof of publication and appellants acknowledge that their appeal was filed long after the expiration of the 30-day appeal period.

It seems clear therefore that pursuant to section 21.52(a) this board had no jurisdiction to consider

the NPDES permit *unless* appellants' appeal can be considered nunc pro tunc.

In Sharon Steel Corporation v. DER, 1978 EHB 205, this board discussed the showing necessary to establish a right to appeal nunc pro tunc. Although the board's holding in Sharon, supra, was directed to section 21.21(e) of its old rules rather than section 21.53 of its present rules, a comparison of these sections reveals that they are virtually identical. Therefore, the authority and reasoning from Sharon, supra, at 210, 211, set forth immediately below *controls* the present matter:

". . . Under and by virtue of the provisions contained in Section 21.21(e) of the Rules of Practice and Procedure before the Environmental Hearing Board, 25 Pa. Code §21.21(e), we have the authority to grant the relief requested. In that section, it is provided, as follows:

"'(e) The board upon written request and for good cause shown may grant leave for the filing of an appeal nunc pro tunc; the standards applicable to what constitutes good cause shall be the common law standards applicable in analogous cases in Courts of Common Pleas in the Commonwealth. No petition may be granted where a statutory period for filing an appeal with the Board has passed.'

"In the leading case of Nixon v. Nixon, 329 Pa. 256, 198 A. 154 (1938), the Supreme Court of Pennsylvania, speaking through Chief Justice Kephart, provided insight into what events would and would not amount to good cause for the allowance of an appeal nunc pro tunc. It was stated, pp. 259-260, as follows:

"'But, as this Court has indicated, the legislative purpose is not to foreclose a party who satisfactorily explains his delay. However, the occasion must be

extraordinary and must involve fraud or some breakdown in the court's operation through a default of its officers, whereby the party has been injured. There can be no extension of time as a matter of indulgence: Schrenkeisen v. Kishbaugh, 162 Pa. 45, 48. Such excuses as a client's illness (Marcus v. Cohen, supra), or neglect of an attorney (Ward v. Letzkis, 152 Pa. 318; Wise v. Cambridge Springs Borough, supra, at p. 144) are insufficient. Fraud, on the other hand (Zeigler's Petition, 207 Pa. 131; York County v. Thompson, 212 Pa. 561) or its equivalent, "the wrongful or negligent act of a court official" (Singer v. Del., L. & W. R. R. Co., 254 Pa. 502, 505) may be a proper reason for holding that, as to the injured person, the statutory period does not run and the wrong may be corrected by means of a petition filed nunc pro tunc within a reasonable time. As was stated in Horn v. Lehigh Valley R.R. Co., 274 Pa. 42, 44, in reference to a statute limiting claims for workmen's compensation: "While the governing sections are mandatory, . . . we have held, where a party has been prevented from doing an act through fraud or circumstances that amount to fraud, the court might extend the time within which to do the act: . . ." And, in Schwartz Bros v. Adams Express Co., 75 Pa. Super. Ct. 402, 403, it was said: Where a party has been prevented from appealing by fraud or by the ignorant or negligent act of a court official, it has been held that the court has power to extend the time for taking an appeal.'

"The principle contained in Schwartz Bros. v. Adams Express Co., supra, which is recited in the above quote from Nixon v. Nixon, supra, was applied in Flynn v. Unemployment Compensation Board of Review, 192 Pa. Superior Ct. 251, 159

A. 2d 579 (1960). In Flynn, supra, a claimant for unemployment compensation whose claim had been rejected by the Bureau of Unemployment Compensation and who had been given written notice of her right to appeal, claimed that she did not timely perfect that appeal because the representative from said bureau, with whom she had been dealing, told her that she could not make the appeal and that she did not have 'a leg to stand on.' The court held that there should be an evidentiary hearing to determine whether claimant's allegations were true and applied the principle that where a *claimant is unintentionally misled by an official who is authorized to act in the premises, the time for appeal could be extended to relieve an innocent party of injury consequent on such misleading act."* * (Emphasis supplied.)

A portion of the evidentiary hearing in this matter was devoted to the question of timeliness. The testimony of one of the appellants, Mrs. Elizabeth Steele, and of several DER employes demonstrates that in late August or early September, 1979 Mrs. Elizabeth Steele first contacted DER's Norristown Office to express her opposition to the Wichard Sewer Company's proposed sewage treatment plant. Upon visits to the DER office, Mrs. Steele asked for and was shown what was supposedly the entire Wichard file but this file did not contain the permittee's NPDES application which had already been received by DER. During the late fall of 1979,

---

*The test set forth above was approved by Commonwealth Court at Sharon Steel Corporation v. DER, 28 Pa. Commonwealth Ct. 607, 369 A. 2d 906 (1977), and the matter was remanded to the board for an evidentiary hearing on the question of timeliness.

Mrs. Steele continued to contact the Norristown Office. A public meeting concerning the proposed project was scheduled for November 8, 1979 and then cancelled. Mrs. Steele was given notice of 537 plan approval and appealed this action. Following her appeal Mrs. Steele specifically discussed with DER's staff whether such an appeal would stay action on the NPDES permit. During all her discussions with DER employees Richard L. Hinkle, James P. Ridolfi, Wilbur Paul Stender, Glen K. Stinson and Charles Rehm, none of these officials alerted Mrs. Steele to the issuance of the NPDES permit. To the contrary, throughout the spring of 1980, Mrs. Steele was advised by DER officials orally and in writing that "the permit" was being withheld until the DRBC had approved the project. In fact, it was not until August 27, 1980 that Mrs. Steele received actual notice that the NPDES permit had been issued and she filed an appeal within 30 days of this date.

Permittee points out that the letters of April 17 and 21, 1980 mentioning "the permit" refer to the water quality management permit which was, indeed, issued after this date, rather than the NPDES permit. But none of the DER officials informed Mrs. Steele that there was a two-permit system even though Mr. Rehm acknowledged that: "Given the time that all this took place, it's quite possible that she was not aware that the two-part system, in fact, came into play."

We feel that by the conduct outlined above the said DER officials unintentionally misled Mrs. Steele into believing that no NPDES permit had been issued up to August of 1980 when, in fact, such a permit had been issued in November of 1979. Accordingly, under the principles of Sharon,

supra, appellants qualify for an appeal nunc pro tunc.

Turning now to the merits, the arguments presented in appellants' post-hearing brief will be addressed in the order raised therein.

The first argument is that DER deprived appellants of due process under the 14th Amendment to the United States Constitution by failing "to show records, cancelling a public hearing and not notifying appellants of NPDES decision."

Insofar as this argument relates to the records and lack of notice of permit issuance, these omissions do not rise to a constitutional level at least where, as here, DER is not accused of failing to comply with proper discovery requests. These omissions have, however, supported appellants' right to appeal nunc pro tunc. As to the lack of a public hearing, the Pennsylvania Supreme Court has held that DER need not hold a hearing prior to its actions due to the opportunity for a hearing before this board: Com. v. Derry Township, 466 Pa. 31, 351 A. 2d 606 (1976).

Appellants' next challenge involves assertions that Horsham Township Well no. 19 which is located within some 200' of the proposed point of discharge (but upstream thereof) would be polluted by backwash from Park Creek after that body of surface water was polluted by permittee's proposed discharge. In the first place Well no. 19 is capped with cement and is double cased to a depth of 21'. The internal casing extends downwards to a depth of 44' thus, the backwash from Park Creek would have to somehow enter the groundwater tapped by Well no. 19 which is at least 150' below the surface.

Since, by the board's rules, appellants have the

burden of proof on this issue they would have to show by substantial evidence that water from Park Creek would be drawn into Well no. 19 and that Park Creek would be polluted by the proposed discharge before they satisfied their burden.

The only testimony concerning underground flows was that of Mrs. Steele who was not qualified by education or experience to offer opinions on hydrology or hydrogeology. Moreover, even if Mrs. Steele's testimony is totally credited it still doesn't suffice since she testified that neither she nor anyone else could tell from what acquifier Well no. 19 drew water. Of course, the same lack of proof undermines appellants' argument based upon Horsham Township's potential water supply wells 8, 12 and 13.

The main thrust of appellants' case grows out of their obviously sincere and well motivated concern over the impact of the proposed discharge upon the persons using three township parks and one state park abutting Park Creek, as well as upon the residential and industrial wells near to Park Creek, the acquatic life in Park Creek and the wild and domestic animals who utilize the creek for drinking water.

Through the testimony of John T. Carson, Jr., a very well qualified acquatic biologist, appellants attempted to establish that the present water quality of Park Creek is high and that the proposed discharge would pollute the creek. As to the present water quality Mr. Carson testified from a report prepared in the late 60's and early 70's. He admitted that his data was some 12 years out of date and that he would need to do some follow-up work (which he did not do) to see whether the quality of Park Creek had changed. Even conceding, for the sake of ar-

gument, however, that the water quality of Park Creek is as high as specified in DER's water quality regulations, 25 Pa. Code Chapter 93, appellants have not carried their burden of showing that the proposed discharge would be likely to cause a violation of the Chapter 93 numbers or would, in any other manner, pollute Park Creek.

Perhaps, because he was retained only very shortly before the hearing, Mr. Carson had not familiarized himself with the permits at issue or with DER's water quality regulations.

Mr. Carson did testify as to his concern over the discharge of nitrogen, phosphorous and chlorine into Park Creek from the proposed plant. He ably demonstrated that the addition of *too much* nitrogen and/or phosphorous, especially to a quite body of water such as Lake Nockamixon, could initiate the biological process of eutrophication which could result in the elimination of a large amount of fish and other acquatic life. However, Mr. Carson was *not* able to testify that the nitrogen limit set by the NPDES permit would allow the Wichard Sewer Company to put too much nitrogen into Park Creek.

Similarly, Mr. Carson could not quantify how much phosphorous would reach Park Creek through the proposed discharge nor could he quantify how much phosphorous could be discharged into Park Creek prior to initiation of deleterious effects on fish and other acquatic life.

Again, with respect to residual chlorine, what is missing in Mr. Carson's testimony is any attempt at quantifying the discharge level of chlorine or connecting that level to the instream level of chlorine necessary to cause harm. Mr. Carson admitted that *every* sewage treatment plant in Pennsylvania discharges some residual chlorine because chlorine is

added by the operators to disinfect the sewage but that the discharge of chlorine does not always cause a problem in the receiving waters. Mr. Carson offered no testimony concerning the amount of chlorine one could expect from the Wichard plant or upon the concentration of chlorine in Park Creek necessary to cause harm. In fact, to the extent that Mr. Carson testified at all concerning the impact of the proposed discharge on Park Creek, he admitted that even the Q(7-10) flow of Park Creek at the point of proposed discharge would be 5 to 6 times the discharge flow which is much higher than his 1 to 1 rule of thumb of stream flow to discharge.

Moreover, Mr. Carson did not assert, let alone establish, that DER violated any statute or regulation in issuing the NPDES permit at issue or that the discharge allowed by this permit would cause any violation of DER's water quality criteria.

For its part DER, through its officials, asserted that it did comply with all relevant law. Mr. Charles Rehm, a qualified sanitary engineer, who worked as DER's chief of planning on the instant permits, testified that Chapter 93 water quality criteria were established by DER for Park Creek in order to protect the use of that creek as a domestic and industrial water supply, as well as for boating, fishing, recreation, stock watering, irrigation and a shelter for the indigenious fish and aquatic life. Moreover, since Park Creek is a water quality limited stream, Mr. Rehm testified DER's permit review process insured that the proposed discharge would not cause any Chapter 93 water quality criteria to be exceeded.

Finally, Mr. Rehm testified as follows on cross-examination:

"Q And are the criteria established in the Per-

mit, the NPDES Permit, such that the water quality after introduction of the effluent will be as good, if not better, than the present water quality in Park Creek?

A The setting of the effluent quality is to protect all water uses at any given day. The effluent probably will be better than the stream quality.

Q As a result of the criteria which have been established and your knowledge of the quality of the Park Creek and the downstream, do you see any adverse environmental effects which would occur through the operation of this plant provided that it does operate in accordance with the NPDES criteria?

A No. The assumptions that we go under when we are setting up our criteria is that, like I said earlier, the criteria are to protect all water uses and that we have reasonable assurance that under the State's Regulations for maintaining a certified operator at the facility that it—if it functions properly would not degrade water quality, then consequently, it would be minimal, if any, adverse environmental effects."

The other arguments raised by appellants merit little discussion. Appellants' arguments concerning the economic impact of exempting Country Springs from Horsham Township's sewer district D were disposed of at Docket no. 79-185-H and cannot be relitigated here.

Appellants' assertion that the instant project does not comport with comprehensive planning fails because under 25 Pa. Code §91.31 the consistency of the Wichard plant with comprehensive planning was validated by the plan approval upheld at Docket no. 79-185-H.

Further, appellants' reliance upon section 71.16

and Pa. Const., Art. I, §27, is misplaced since each of these provisions is triggered by at least a modicum of adverse environmental impact which appellants have failed to demonstrate.

Finally, appellants' reliance upon section 91.32 is inapposite, first because section 91.32 does not operate where there has been compliance with section 91.31 and secondly, because section 91.32 contemplates the availability of public sewerage facilities within a reasonable period in the area of Horsham Township presently under discussion. No such facilities presently exist and the only thing known about their eventual appearance is that they will not appear before 1984.

## CONCLUSIONS OF LAW

1. The board has jurisdiction over the parties and subject matter of this appeal.

2. DER has not violated The Clean Streams Law, the Sewage Facilities Act or Pa. Const., Art. I, §27, or any other constitutional, statutory or regulatory provisions by the issuance of either the NPDES or water quality management permit.

3. DER was not arbitrary or capricious in issuing either of the above said permits.

## ORDER

And now, May 13, 1981, DER's issuance of NPDES Permit 0050253 and water quality management permit 4680407 are sustained and appellants' appeal is dismissed.